WALKER (CHASE v.). See Case No. 2,630.

---

## Case No. 17,067.

WALKER v. CRANE.

[13 Blatchf. 1.] [1]

Circuit Court, D. Vermont. Oct., 1865.[2]

PROVOST MARSHAL — LIABILITY FOR ASSAULT AND BATTERY—AUTHORITY TO USE FORCE—EVIDENCE—DAMAGES.

1. C., a provost marshal appointed under the act of March 3d, 1863 (12 Stat. 732, § 5), was sued by W. for assault and battery, and false imprisonment. C. contended that he could not be held liable in a civil action for acts done by him in the discharge of the duties of his office of provost marshal. Held, that the action would lie.

2. C. had a right to order W. to leave the premises occupied officially by C. as provost marshal, and the right, if W. refused to go, to use so much force as was necessary to remove W. from such premises.

3. If C. had good reason to believe, and did believe, that W., by language addressed by him to C., was threatening C. for the purpose of interfering with C. in the execution of his official duties as provost marshal, C. was justified in arresting and detaining W.

---

[1] [Reported by Hon. Samuel Blatchford, Circuit Judge, and here reprinted by permission.]

[1] [Reported by Hon. Samuel Blatchford, District Judge, and here reprinted by permission.]
[2] [Affirmed by supreme court. Unreported.]

4. The 4th section of said act of March 3d, 1863, would not, of itself, bar W.'s right of action.

5. W., if entitled to recover, was entitled to his actual damages; and, if C. was influenced by any motive other than the honest discharge of his official duty, the jury were at liberty to give to W. exemplary damages.

This was an action of trespass for an assault and battery and false imprisonment, originally brought returnable to the county court for the county of Chittenden and state of Vermont, by writ dated August 23d, 1864, which being returned and entered in said court at the September term thereof, in 1864, the defendant [Cyrus R. Crane] filed his petition for the removal of the cause to this court, under section 5 of the act of March 3d, 1863 (12 Stat. 756), and the cause was removed into this court, and at the October term, in 1865, of this court, came on for trial before SMALLEY, District Judge, and a jury, on the defendant's plea of not guilty.

On the trial, the plaintiff [Hiram Walker] gave evidence tending to show, that he was, on and before the 2d of August, 1864, a manufacturer in Burlington, Vermont, and had, at that time, a man in his employ named Dike, who was liable to military duty, and whose home was in the town of Starksborough, Vermont; that the town of Starksborough was then offering to pay to any person who would put into the United States service a substitute who should be credited to the quota of that town, the sum of $900 as a bounty; that Dike applied to the plaintiff to assist him in obtaining a substitute, to be credited to Starksborough, so as to relieve himself from liability to draft, and to avail himself, in so doing, of the bounty offered by that town, and proposed to pay the plaintiff for his services in obtaining such substitute; that the plaintiff declined to accept any compensation, but agreed to assist Dike in obtaining the substitute; that, soon afterwards, the plaintiff was called on, at Burlington, by one Norton, of Champlain, N. Y., with whom he had no previous acquaintance, but who had been informed that the plaintiff desired to procure a substitute; that Norton was then on his way to Rutland, with three Frenchmen from Canada, with whom he had contracted that they should enlist in the United States service, and had had some correspondence with the selectmen of Rutland, relative to furnishing three men upon the quota of that town; that the plaintiff and Norton concluded an agreement that one of the men should be enlisted as a substitute for Dike, and credited to the town of Starksborough, and that the plaintiff should pay Norton therefor the sum of $900 when the man should be enlisted and sworn in; that, on the next day after the making of this agreement, the plaintiff accompanied Norton and the men to Rutland, for the purpose of getting the substitute for Dike enlisted and credited; that, on their arrival, some considerable discussion and negotiation took place between Norton and the authorities of Rutland, in which the plaintiff took no part, relative to a bargain for furnishing the other two men upon the quota of Rutland; [that, while this was going on, the plaintiff was called on by one N. P. Simonds, who was then engaged in and about the defendant's office (the defendant being provost marshal), and passing freely in and out, and who said he was a United States recruiting agent, and offered to put the substitute in for the plaintiff for $100, and said he was the only man in Rutland who could put a substitute in through that office, and that he intended to make $100 per head off of the men; and that plaintiff declined this proposition, but subsequently, after watching the proceedings there for some time, offered Simonds $25 to get his man enlisted as a substitute for Dike, which offer Simonds accepted.] So much of the foregoing evidence as is included in brackets was objected to by the defendant and admitted by the court, to which the defendant excepted. The plaintiff further gave evidence tending to show, that, soon afterwards, the men brought by Norton were taken in for examination, and, two of them having passed and been accepted, Simonds spoke to the plaintiff and told him it was all right, and to go up-stairs to the provost marshal's office and pay off his man; that the plaintiff thereupon started with the man to ascend the stairs in the United States post office building, which stairs led from the public room in the post office to the rooms in the second story occupied by the provost marshal's office, and, when he got up some distance, was met by the defendant, whom he did not then know, who took hold of his arm and asked him where he was going; that the plaintiff replied, that he was going up-stairs with those men; that the defendant then said: "Go downstairs; you are a substitute broker!" and shoved him down three or four steps; that the plaintiff replied: "I am not a substitute broker; my name is Walker, from Burlington, and I came to put in a substitute for a man named Dike, from Starksborough;" that the defendant still insisted he was a substitute broker, and shoved him down stairs again twice, three or four steps each time, till he reached the bottom; that the plaintiff then said to him: "If you will come out of doors I will show you something;" that the defendant asked: "What will you show me?" that the plaintiff replied: "I will show you how a gentleman defends himself when he is assailed;" that the defendant thereupon called one Briggs, who stood near, and ordered him to take the plaintiff to jail; that the plaintiff enquired what he was taken to jail for, and the defendant said: "For violating the provisions of the enrolment act, and resisting the provost marshal in the discharge of his duty;" that Briggs took the plaintiff to the county jail in Rutland, and imprisoned him there in the common prison, then occupied by a number of criminals and vagrants, where he remained about ten minutes; that, while on the way to the jail, the plaintiff offered to the officer to furnish bail in any

amount for his appearance at any time, which the officer declined to receive; that, when the plaintiff had been in jail about ten minutes, the defendant sent a couple of soldiers for him, who brought him back to the post office building, and, by direction of the defendant, took him into the cellar of the building, where there were cells used for United States prisoners; that the defendant went below and had a long conversation with the plaintiff, charging him with being a bounty broker, and with having lied to the defendant, and making other remarks of a similar character, and demanding that he should make an apology; that, on the plaintiff's stating what his business was with the provost marshal, and that Simonds had requested him to go up-stairs, the defendant said that would make a difference, and sent for Simonds and enquired of him as to that fact, to which Simonds replied that he did not remember whether he had asked the plaintiff to go up-stairs or not; that the defendant finally discharged the plaintiff from custody, saying that he did so on account of the respect he entertained for the plaintiff's father; that the man agreed for by the plaintiff, as aforesaid, was afterwards, on the same day, enlisted as a substitute for Dike; and that the plaintiff was sent for by the defendant to come to his office and pay the man, which he did, and also that he paid Simonds $25 for his services. The plaintiff further testified, that he had never, in any instance, had anything whatever to do with procuring substitutes, or obtaining men for enlistment, except on this single occasion, and never had any interest or share in any such business, directly or indirectly; and that he did not know Norton until applied to by him, as above stated, and had nothing to do with him or his recruits except to obtain the substitute for Dike, as above stated, and no interest or share otherwise in the disposal of the men, or in the money received therefor.

The defendant introduced in evidence the following documents:

(1) His commission as provost marshal, dated April 24th, 1863: "War Department, Washington, April 24th, 1863. Sir: You are hereby informed that the president of the United States has appointed you provost marshal for the First district of the state of Vermont, with rank of captain of cavalry, in the service of the United States, to rank as such from the 24th day of April, 1863. Immediately on receipt hereof, please to communicate to this department, through the provost marshal general of the United States, your acceptance or non-acceptance of said appointment, and, with your letter of acceptance, return the oath herewith enclosed, properly filled up, subscribed and attested, and report your age, birthplace, and the state of which you are a permanent resident. You will immediately report, by letter, to the provost marshal general, and will proceed without delay to establish your headquarters at Rutland, Vermont, and enter upon your duties in accordance with such special instructions as you may receive from the provost marshal general. E. M. Stanton, Secretary of War. To Capt. Cyrus R. Crane, Provost Marshal First District Vermont."

(2) Special order of the war department, No. 221, detailing Gen. Thomas G. Pitcher as assistant to the provost marshal general for the state of Vermont, dated May 18th, 1863: "War Department, Adjutant General's Office, Washington, May 18th, 1863. Special Orders, No. 221. (Extract.) * * * Brigadier General Thomas G. Pitcher, U. S. volunteers, will proceed without delay to Montpelier, Vermont, and enter upon the duties of assistant to the provost marshal general of the United States, for the state of Vermont. * * * By order of the secretary of war. E. D. Townsend, Assistant Adjutant General."

(3) Revised regulations issued by the war department, May 1st, 1864, for the government of the bureau of the provost marshal general, particularly sections 1, 2, 19, 22, 24, 27 and 32: "Sec. 1. The officer detailed in each state or division to aid the war department in securing uniformity in the execution of the enrolment act, shall keep himself well informed as to the condition of the department throughout the state or division. He shall, under the provost marshal general of the United States, exercise supervision over the provost marshals and their subordinates, for the congressional districts of that state or division, and shall see, by personal inspection, or by his inspectors, that boards of enrolment, and persons acting under them, attend faithfully and diligently to their duties. Sec. 2. He shall communicate to them the orders and instructions of the provost marshal general, and see that they are promptly and efficiently executed, and shall, from time to time, give or transmit such instructions, in accordance with these regulations, as hereinafter prescribed, as may be required to facilitate and enforce obedience to them. Sec. 19. Immediately upon entering upon his duties, each provost marshal shall report, by letter, to the provost marshal general of the United States, and the acting assistant provost marshal general of his state. Sec. 22. (Section 7 of the act for enrolling and calling out the national forces, approved March 3d, 1863—that it shall be the duty of the provost marshals to obey all lawful orders and regulations of the provost marshal general, and such as may be prescribed by law, concerning the enrolment and calling into service of the national forces.) Sec. 24. It shall be the duty of the provost marshal in each district to call together, when required, the board of enrolment, to preside at its sessions, announce such of its decisions or directions as it may be necessary to make public, enforce its orders, see that a fair record is made of its proceedings, in a book kept for that purpose by the recorder, and to transmit to the provost marshal general the enrolment lists, as consolidated by the board, and such other communications as the board may deem it necessary to lay before the provost marshal general. Sec. 27. He shall arrest and forthwith deliver to the proper civil

authorities, to wit, the marshal of the United States within and for the district in which the arrest is made, with written charges in the case, all persons who shall have violated section 12 of the act amendatory of the enrolment act, or any part of the same. Sec. 32. To enable provost marshals to discharge their duties efficiently, they are authorized to call upon the nearest available military force, or on citizens, as a posse comitatus, or on United States marshals and deputy marshals; and these and all other persons are hereby enjoined to aid the provost marshal in the execution of his lawful duties, when called on so to do."

(4) Regulations from the war department, dated September 29th, 1863, particularly section III: "III. Persons deputized as aforesaid, to arrest deserters and procure recruits, presenting to your board a man acceptable as a recruit, according to the present ruling of acceptability, as applied by this bureau, shall receive premiums as follows, to wit: for an accepted recruit who may be shown to the board to have served at least nine months as a soldier, and been honorably discharged (for other cause than disability), a premium of $25; for an accepted recruit without the military qualifications above specified, a premium of $15. The premiums herein provided will be paid to the persons who shall have presented the accepted recruit, as soon as said recruit shall have been delivered at the general rendezvous at ——. The payment of the premium will be made by —— in the ——, whenever the person who furnished the recruit shall present to him a certificate from your board that the recruits named, and for whom he claims premiums, were accepted and regularly enlisted, and a certificate from the commanding officer at the general rendezvous at ——, that the said recruits have actually been received at his rendezvous. You are authorized and required, notwithstanding anything else herein contained, to decline all business, in the matter of recruits, with any person or persons who may at any time practice, or attempt to practice, fraud or imposition, either upon the government or the person presented as a recruit, or who shall extort, claim, or receive any other fee, perquisite, or compensation from the government, or the recruit, than the premium herein authorized and provided, and such persons shall forfeit their appointments, and all right to any premiums or payments, and be reported to the provost marshal general, to be dealt with summarily by a military commission. You are required to facilitate the procuration of recruits in the manner herein prescribed, by early examination of them, prompt preparation of certificates upon which the payments of premiums depend, and by everything else properly devolving on you, calculated to assist the persons presenting recruits in securing their premiums without unnecessary delay. You will immediately nominate, through the acting assistant provost marshal general of the state, one or more persons whom you deem best suited for recruiting agents for your district, that they may be deputized for that purpose."

(5) Circular No. 28, dated June 16th, 1863, from the office of the provost marshal general: "War Department, Provost Marshal General's Office, Washington, D. C. June 16th, 1863. (Circular No. 28.) The following opinion of Hon. William Whiting, solicitor of the war department, has been ordered to be published by the secretary of war: Opinion. It is made the duty of the provost marshals to obey all lawful orders and regulations of the provost marshal general, and such as may be prescribed by law, concerning the enrolment and calling into service of the national forces. Act March 3d, 1863, § 7. The 25th section of the same act provides, that, if any person shall resist any draft of men enrolled under this act into the service of the United States, or shall counsel or aid any person to resist any such draft, or shall assault or obstruct any officer in making such draft, or in the performance of any service in relation thereto, or shall counsel any person to assault or obstruct any such officer, or shall counsel any drafted men not to appear at the place of rendezvous, or wilfully dissuade them from the performance of military duty as required by law, such person shall be subject to summary arrest by the provost marshal, and shall be forthwith delivered to the civil authorities, and, upon conviction thereof, be punished by a fine not exceeding $500, or by imprisonment not exceeding two years, or by both of said punishments. To do any act which will prevent or impede the enrolment of the national forces (which enrolment is preliminary and essential to the draft), is to prevent or impede the draft itself. The enrolment is a 'service to be performed by the provost marshal in relation to the draft.' It is not the act of drawing ballots out of a ballot box itself, but it is 'in relation to it,' and is the first step that must by law be taken preparatory to draft. It is, therefore, clearly within the duty of the provost marshal to subject all persons who obstruct the enrolment, the meeting of the board, or any other proceeding which is preliminary and essential to the draft, to summary arrest, according to the provision of section 25. There are many ways of obstructing officers in the performance of their 'services or duty in making, or in relation to, the draft,' without employing physical force. The neglect or refusal to do an act required by law to be done, may itself be such an 'obstruction' as to subject the offender to arrest. Suppose a person be found standing in a passage through which the drafting officers were required to enter into a place designated by law as the place for draft, and suppose that his standing in that place would prevent access by these officers to the place of draft. If they request him to move away, and he neglects or refuses so to do, for the purpose of preventing the draft, the non-performance of the act of removal would be itself an 'obstruction of the draft, or of an officer in the performance of his

duty in relation to it.' Standing mute in civil courts, is, under certain circumstances, a punishable offense; and so, if a person, with intent to prevent the draft, refuses to give his true name when lawfully requested so to do by an officer whose legal duty is to ascertain and enrol it, it is an obstruction of that officer in the performance of one of his duties in relation to the draft. So, also, of the giving of false names with the same illegal intent, and the offender will, in either case, be subject to summary arrest by the provost marshal. William Whiting, Solicitor of the War Department. James B. Fry, Provost Marshal General." This paper was objected to by the plaintiff, and was received by the court subject to the objection.

(6) The call of the president for 500,000 men, dated July 18th, 1864: "War Department, Adjutant General's Office, Washington, July 19th, 1864. For Five Hundred Thousand Volunteers. By the President of the United States of America—A Proclamation. Whereas, by the act approved July 4th, 1864, entitled, 'An act further to regulate and provide for the enrolling and calling out the national forces, and for other purposes,' it is provided, that the president of the United States may, 'at his discretion, at any time hereafter, call for any number of men, as volunteers, for the respective terms of one, two, and three years, for military service,' and 'that, in case the quota, of (or) any part thereof, of any town, township, ward of a city, precinct, or election district, or of a county not so subdivided, shall not be filled within the space of fifty days after such call, then the president shall immediately order a draft for one year, to fill such quota, or any part thereof, which may be unfilled;' and whereas the new enrolment heretofore ordered is so far completed as that the aforementioned act of congress may now be put in operation, for recruiting and keeping up the strength of the armies in the field, for garrisons, and such military operations as may be required for the purpose of suppressing the rebellion, and restoring the authority of the United States government in the insurgent states: Now, therefore, I, Abraham Lincoln, president of the United States, do issue this my call for five hundred thousand volunteers for the military service, provided, nevertheless, that this call shall be reduced by all credits which may be established under section eight of the aforesaid act, on account of persons who have entered the naval service during the present rebellion, and by credits for men furnished to the military service in excess of calls heretofore made. Volunteers will be accepted under this call for one, two, or three years, as they may elect, and will be entitled to the bounty provided by the law for the period of service for which they enlist. And I hereby proclaim, order, and direct, that, immediately after the 5th day of September, 1864, being fifty days from the date of this call, a draft for troops

to serve one year shall be had in every town, township, ward of a city, precinct, or election district, or county not so subdivided, to fill the quota which shall be assigned to it under this call, or any part thereof which may be unfilled by volunteers on the said 5th day of September, 1864. In testimony whereof, I have hereunto set my hand and caused the seal of the United States to be affixed. Done at the city of Washington, this eighteenth day of July, in the year of our Lord one thousand eight hundred and sixty-four, and of the independence of the United States the eighty-ninth. (L. S.) Abraham Lincoln. By the President, William H. Seward, Secretary of State. By order of the secretary of war, E. D. Townsend, Assistant Adjutant General."

(8) Proclamation of the president suspending the privilege of the writ of habeas corpus, dated September 15th, 1863: "War Department, Provost Marshal General's Office, Washington, D. C., September 17th, 1863. The secretary of war orders that the following act of congress, and proclamation of the president based upon the same, be published for the information of all concerned, and that the special instructions hereinafter contained for persons in the military service of the United States, be strictly observed. 'An act relating to habeas corpus, and regulating judicial proceedings in certain cases, approved March 3d, 1863. Be it enacted by the senate and house of representatives of the United States of America in congress assembled, that, during the present rebellion, the president of the United States, whenever, in his judgment, the public safety may require it, is authorized to suspend the privilege of the writ of habeas corpus in any case throughout the United States, or any part thereof; and, whenever and wherever the said privilege shall be suspended, as aforesaid, no military or other officer shall be compelled, in answer to any writ of habeas corpus, to return the body of any person or persons detained by him by authority of the president; but, upon the certificate, under oath, of the officer having charge of any one so detained, that such person is detained by him as a prisoner under authority of the president, further proceedings under the writ of habeas corpus shall be suspended by the judge or court having issued the said writ, so long as said suspension by the president shall remain in force, and said rebellion continue.' 'By the President of the United States.—A Proclamation. Whereas, the constitution of the United States has ordained that the privilege of the writ of habeas corpus shall not be suspended, unless when, in cases of rebellion or invasion, the public safety may require it; and whereas, a rebellion was existing on the third day of March, 1863, which rebellion is still existing; and whereas, by a statute, which was approved on that day, it was enacted by the senate and house of representatives of the United States in congress assembled, that, during the present insurrection,

the president of the United States, whenever, in his judgment, the public safety may require, is authorized to suspend the privilege of the writ of habeas corpus in any case, throughout the United States, or any part thereof; and whereas, in the judgment of the president, the public safety does require that the privilege of the said writ shall now be suspended throughout the United States, in the case when, by the authority of the president of the United States, military, naval, and civil officers of the United States, or any of them, hold persons under their command, or in their·custody, either as prisoners of war, spies, or aiders or abettors of the enemy, or officers, soldiers, or seamen enrolled, drafted, or mustered or enlisted in, or belonging to, the land or naval forces of the United States, or as deserters therefrom, or otherwise amenable to military law, or the rules and articles· of war, or the rules or regulations prescribed for the military or naval services by authority of the president of the United States, or for resisting a draft, or for any other offence against the military or naval service: Now, therefore, I, Abraham Lincoln, president of the United States, do hereby proclaim and make known to all whom it may concern, that the privilege of the writ of habeas corpus is suspended throughout the United States, in the several cases before mentioned, and that this suspension will continue throughout the duration of the said rebellion, or until. this proclamation shall, by a subsequent one to be issued by the president of the United States, be modified or revoked. And I do hereby require all magistrates, attorneys, and other civil officers within the United States, and all officers and others in the military and naval service of the United States, to take distinct notice of this suspension, and to give it full effect, and all citizens of the United States to conduct and govern themselves accordingly, and in conformity with the constitution of the United States and the laws of congress in such case made and provided. In testimony whereof, I have hereunto set my hand, and caused the seal of the United States to be affixed, this 15th day of September, in the year of our Lord one thousand eight hundred and sixty-three, and of the Independence of the United States of America the eighty-eighth. (L. S.) Abraham Lincoln. By the president, William H. Seward, Secretary of State.' The attention of every officer in the military service of the United States is called to the above proclamation of the president, issued on the 15th day of September, 1863, by which the privilege of the writ of habeas corpus is suspended. If, therefore, a writ of habeas corpus should, in violation of the aforesaid proclamation, be sued out and served upon any officer in the military service of the United States, commanding him to produce before any court or judge any person in his custody by authority of the president of the United States, belonging to any one of the classes specified in the president's proclamation, it shall be the duty of such officer to make known by his certificate, under oath, to whomsoever may issue or serve such writ of habeas corpus, that the person named in said writ 'is detained by him as a prisoner under authority of the president of the United States.' Such return having been made, if any person serving, or attempting to serve, such writ, either by the command of any court or judge, or otherwise, and with or without process of law, shall attempt to arrest the officer making such return, and holding in custody such person, the said officer is hereby commanded to refuse submission and obedience to such arrest, and if there should be any attempt to take ·such person from the custody of such officer, or arrest such officer, he shall resist such attempt, calling to his aid any force that may be necessary to maintain the authority of the United States, and render such resistance effectual. James B. Fry, Provost Marshal General."

(9) ·Letter from the provost marshal general to the defendant, approving N. P. Simonds' appointment by the defendant as recruiting agent: "War Department, Provost Marshal General's Office, Washington, D. C., October 13th, 1863. Captain C. R. Crane, Provost Marshal, 1st District of Vermont, Rutland, Vt. Captain: 1 am directed by the provost marshal general to acknowledge receipt of your communication of the 1st inst., nominating N. P. Simonds and George Hopkins as recruiting agents, and to say, in reply, that their nomination is approved. I am, captain, very respectfully, your obedient servant, Henry Stone, Ass't Adj't General."

The defendant further gave evidence tending to show that General Pitcher had acted under his said appointment as assistant provost marshal general for Vermont, from the date thereof, and had received and communicated to the defendant officially, as instructions, papers 3, 4 and 5, above mentioned; that the defendant had received a verbal order from General Pitcher, to exclude from his office all bounty brokers and other persons not having proper business with the office, and to arrest them in case of threats or refusal to obey orders; that the defendant had acted as provost marshal, under his said appointment, from the date thereof, having his office at Rutland, in the building belonging to the United States, and occupied as a United States court house and post office, under a cession of the state of Vermont, under an act entitled "An act ceding to the United States exclusive jurisdiction over a site for a court house and post office in the towns of Rutland and Windsor," approved November 18th, 1856; that he occupied two rooms therein, one below for the examination of recruits, and one in the second story for the general business of the office, the communication between which was the staircase before mentioned, leading from the public room in the post office; that it was nec-

essary for him frequently to pass up and down between the two rooms; that there were usually a good many people there having business with his office; that such was the case on the day of the transaction in question; and that he was then engaged in correcting the enrolment and receiving recruits. The defendant testified further, that, after the men above referred to had been examined and passed, and had gone up stairs to be sworn in, he overtook the plaintiff on the stairs, going up; that he asked the plaintiff if he had any business at the office, and he replied that he had not; that the defendant then told him the office was very much crowded, and they were very busy, and he wanted him to go down stairs; that the plaintiff did not move to go, and the defendant said: "You are a substitute broker, and my orders are not to allow one in or about my office, and I want you to go down these stairs, and now;" that the plaintiff replied: "I am Hiram Walker, of Burlington;" to which the defendant replied: "I know who you are, and have known you before," and then shoved the plaintiff down stairs, two or three stairs at a time, the plaintiff, stopping and clinging to the railing; that the plaintiff then said: "If you will come out here, Capt. Crane, I will settle this with you;" that defendant asked him what he would do. and he replied that he would defend himself; that the defendant then arrested him, and, to his inquiry what he was arrested for, replied, for threatening the defendant in the discharge of his official duties; and that the defendant called on Levi Briggs, a deputy sheriff, to take the plaintiff to jail, and, on the plaintiff's inquiry by what authority, the defendant said, by virtue of the enrolment act and his instructions to arrest those who threatened him in the performance of his duties. The defendant further testified, that he understood the above language of the plaintiff to convey a threat, and feared the plaintiff would assault him when he should afterwards be passing up and down in the course of his business. He further testified, and gave evidence tending to show, that the plaintiff had been pointed out to him as a bounty broker, and as the one who had come with the three men above named, and that, at the time of the assault. he supposed the plaintiff was a bounty broker. In this connection he offered to prove that there was a brother of the plaintiff who was a bounty broker, and that he supposed this to be the man. This offer was objected to by the plaintiff, and excluded by the court, to which the defendant excepted. The defendant, also, introduced the said Simonds as a witness. who testified, that the plaintiff did, in fact, attempt to negotiate with the authorities of Rutland for furnishing the other men brought by Norton, to be applied on the quota of that town, and professed to have an interest in the disposition of the men. Said Simonds, also, denied that he told the plaintiff that he was the only man who could put in a recruit through that office, or offered to put the man in for $100, and testified, that he told the plaintiff he could go and put the man in himself, and he would be well received, but that the plaintiff declined to do so, and offered him $25 to do the business. He further testified, that he was appointed a United States recruiting agent in 1863, receiving a premium under the regulations of the war department, of September 29th, 1863, which premium was taken away in July, 1864, but that his appointment was not revoked until September, 1864, and that he continued, up to that time, to act as recruiting agent, and acted in connection with the provost marshal's office, and was employed by the town of Rutland to assist in filling its quota. On cross-examination of Simonds, the plaintiff sought to prove by him, that he was himself, both before and after the 3d of August, 1864, largely engaged in business at that office. as a bounty and substitute broker, and engaged in procuring and furnishing recruits for towns and individuals, under contract, by which he received one sum for the recruit furnished, and paid the recruit a less sum; that he, in some instances, received from the towns the bounties voted by them for recruits, and then obtained the recruits as cheap as he could; that he made from $50 to $250 each, on the men he so furnished, by receiving as their bounties that amount more than he paid the recruits; that he had proposed to various persons, namely, to one William Walker, and one Artemas Powers, to go into partnership with them in the business of substitute and bounty brokers, at that office; that he had been in partnership with one Shute, of Boston, in the business of furnishing naval recruits at the defendant's office, for which he received $1,000 each. and paid Shute $900; that he was, also, in the habit of receiving from towns and individuals liable to furnish recruits and substitutes. and bringing suitable men there to be enlisted for that purpose, from $25 to $100 per man for his services in getting them accepted and enlisted. and had received these fees in many instances, and received $50 from Norton for his services in getting accepted the other men brought by him on this occasion, who were enlisted; that, during all this time, he had free access to, and intimate communication with, the defendant's office; that, in one or two instances, where parties bringing men had refused to pay him, their men had been rejected on the ground that enough of the bounty to be received was not to be paid to the recruit; and that it was known to the defendant that Simonds was so acting as a substitute and bounty broker, as aforesaid, and receiving premiums and compensations, as aforesaid, during the time he was so acting. To these inquiries, and to the offer to prove these facts, the defendant objected, but the inquiries were permitted by the

court, and the defendant excepted, and the answers and the testimony of the witness tended to prove the foregoing facts. But the witness denied, as did, also, the defendant, that the defendant received any share of the money so derived; and Simonds further stated, that the difference between himself and a bounty broker was, that his proceedings were approved by the department. The defendant, on his cross-examination, stated that he considered a bounty broker to be one who was engaged in obtaining and furnishing recruits at a profit, and who was not vouched for to him; if vouched for, he should not regard him as a bounty broker; and if vouched for by Simonds, it would be sufficient. Gen. Pitcher, upon his cross-examination, testified, that, after the call for 500,000 men above referred to was made, the recruiting agents received nothing from the government; that he (Gen. Pitcher) never authorized them, after that, to receive anything from individuals or from towns; that, after the order of July 19th, 1864, they were forbidden to receive any such payments; that he knew nothing of Simonds, except that he was a recruiting agent; and that anything he did after the 19th of July, 1864, by which he received pay of towns or others, was a matter entirely between him and them.

The plaintiff, in reply, introduced further evidence tending to corroborate his statement of the conversation that took place between him and the defendant on the stairway, at the time of the assault, and to contradict the statement of that conversation given by the defendant, and also denied, and gave evidence tending to disprove, the statement of Simonds, both as to the conversation between him and the plaintiff, and as to the plaintiff's taking any part in the disposition of the other men brought by Norton, and claiming to have any interest in, or connection with, them; and also denied, and gave evidence tending to disprove, the statement that he knew the defendant, or called him by name, at the time of the assault.

The defendant claimed as the law of the case, and requested the court to instruct the jury (1) that the defendant was protected by the provisions of section 4 of the act of congress, approved March 3d, 1863, entitled "An act relating to habeas corpus, and regulating judicial proceedings in certain cases" (12 Stat. 756), and that the court should direct a verdict for the defendant; (2) that, upon the evidence, and the law applicable to the case, the justification of the defendant was made out, and that the jury be instructed to return a verdict for the defendant; (3) that, if the jury should find that the defendant, in the making of the assault, and in the arrest and imprisonment, acted in good faith and without malice, and in the performance of the duties of his office, in obedience to superior orders, as then understood by him, and then publicly proclaimed, the jury should return a verdict for the defendant; (4) that if the jury should find

as in point 3, the plaintiff could not recover on the first count of his declaration; (5) that, if the jury should find that the defendant had good reason to believe, from the conduct of the plaintiff, and from the information which had been communicated to the defendant, that the plaintiff was a bounty broker, and that the defendant did so believe, the defendant, under his orders, was not liable to the plaintiff, in this action, for treating him as a bounty broker and excluding him from the approaches to the defendant's office; (6) that it was not necessary to the defendant's justification of the assault upon the stairs, that he should have announced to the plaintiff who he was, or his authority for ejecting the plaintiff. The plaintiff's counsel having remarked to the jury, in the opening, that the case was one of great public importance, involving the vindication of the private rights and liberty of the citizens against arbitrary military power, in comparison with which the plaintiff's individual injury became insignificant, and that, in the assessment of damages, this consideration should be attended to, and contribute to enhance them, the defendant further requested the court to instruct the jury, that this consideration was not an element which they should regard as going to increase the damages.

George F. Edmunds, Edward J. Phelps, and Andrew Tracy, for plaintiff.

Dudley C. Denison, Dist. Atty., Daniel Roberts, and John Prout, for defendant.

THE COURT [SMALLEY, District Judge] charged the jury upon the points involved in the requests, as follows: That there were certain facts about which there was but little, if any, dispute; that the defendant was a provost marshal, and had an office in a building which belonged to the United States, and, at the time of the transaction out of which this controversy grew, was engaged in the performance of his official duties therein; that the plaintiff wanted to have a person enlisted as a substitute for one Dike, and that he went to Rutland, and started to go up into the defendant's office, aforesaid, for that purpose, and was pushed or forced down by the defendant; that, after he got to the bottom of the stairs, the plaintiff said to the defendant, while still in the building: "If you will come down here, I will show you how I will defend myself," or words to that effect; that the defendant then told one Briggs, who was standing near, and a deputy sheriff, to arrest the plaintiff and commit him to jail, and that said Briggs did so, where the plaintiff was confined a few minutes, when the defendant sent two soldiers for him, took him out of jail, and brought him back to the building from which he was first taken, when a conversation ensued between the defendant, the plaintiff, and one Simonds, which ended by the defendant's telling the plaintiff that he might go, and ordering him to be released; and that the defendant claimed that the civil law had been suspended in Ver-

mont, in cases like this, and that martial law had been substituted therefor, and, that if the defendant was wrong, he should be tried by court martial. THE COURT, after explaining the difference between civil law and martial law, told the jury, that this claim of the defendant was unfounded, that the civil law was still in force in Vermont, and that, although the defendant was an officer in the military service of the United States, and claimed to be acting in his official capacity, the plaintiff had a right to seek redress for wrongs or injuries such as he claimed to have sustained in this case from the defendant; that, if the jury found, from all the evidence, that, when the plaintiff and the defendant met on or at the top of the stairs, as described, the defendant told the plaintiff to go down, that he did not want him there, and the plaintiff refused or declined to go, the defendant had the legal right to use so much force as was necessary to put him down; that, if the defendant had good reason to believe, and actually did believe, that what was said and done by the plaintiff after he was pushed to the bottom of the stairs, was intended to be or was a threat or menace for the purpose of interfering with the defendant in the execution of his official duties as provost marshal, or in any way to deter him therefrom or molest him therein, the defendant was justified in ordering his, the plaintiff's, arrest and detention in the manner stated by the witnesses; and that the jury, in coming to a conclusion upon that question, should carefully consider all the circumstances, as they appeared from the testimony and the surroundings of the parties at the time, and, if they were satisfied that such language and conduct of the plaintiff did amount to such threat or menace as before described, they would return a verdict for the defendant. THE COURT further instructed the jury, that the 4th section of the act of congress, approved March 3d, 1863, would not, as claimed by the defendant's counsel, of itself protect the defendant, or bar the plaintiff from his right of action, provided the jury found the facts to be as claimed by the plaintiff, as before stated, and, for this trial, THE COURT charged, that that section was inoperative, and afforded no defence; that if, under these instructions, the jury should find a verdict for the plaintiff, they were bound to give him his actual damages, and, if they should think the case required it, they might give him exemplary damages; that, upon this point they should carefully examine all the evidence in the case, and the arguments of counsel thereon, and if, after full consideration, they found that the defendant, in causing the arrest and imprisonment of the plaintiff, was influenced by any motive other than the honest discharge of, his official duty, they were at liberty to consider it in making up the verdict; that this question was peculiarly within their province; and that, if they found for the plaintiff, they would award him such damages as they thought .justice required.

To the refusal of the court to charge as the defendant requested, and to the charge as made, the defendant excepted. The jury returned a verdict for the plaintiff for $1,000 damages.

The district attorney was directed by the attorney general of the United States to bring and prosecute a writ of error, in behalf of the defendant, from the judgment of the court, with the consent of the defendant. This was done, and the supreme court of the United States affirmed the judgment. [Unreported.]